First case on our call this morning is case number 106-200, People of the State of Illinois v. Michael P. Cardamone, agenda number 6. Good morning. I'm Mark Levine of the Office of the State Appellate Defender, and I'm representing Mr. Cardamone. Mr. Cardamone was convicted of harassment of a witness, which is a Class II felony. He was sentenced to three years in prison on that conviction, consecutive to his sentence in another case. That other conviction has since been reversed and remanded for a new trial, and Mr. Cardamone has now completed his sentence in this case. So what's at stake here today is the Class II felony conviction. Now there are two issues on appeal. One, whether what he did could have been intended to inflict enough emotional distress to be this Class II felony, and there's a disagreement on that point, between the Second District, our court below, and the Fifth District, based on the, and interpreting the statute to make it constitutional. The other issue, which is the one I really want to address, is whether he could have intended, whether the evidence is sufficient to show that he could have intended to cause any emotional distress at all. Whether what he did was too remote to be even an indirect communication, and since the whole case can be disposed of based on this issue, that's the one I would like to address now. The statute requires the specific intent to annoy or harass, and there's a lot more to the statute, but this is the pertinent part now. Here, it cannot be inferred from the evidence that Mr. Cardamone intended that the complainant be stopped by the police at all, by his call. So without a stop, without the police stop, there'd be no annoyance to the complainant, there's no communication, there's nothing. So the question naturally springs to mind, what did he expect when he called 9-1-1? Well, that really is the question, and that question has to be answered by the natural and probable consequences of reporting on 9-1-1 what he reported. Mr. Levine, I know this wasn't the focus of the briefs, and I know the focus is really on this communication with the police and 9-1-1 and whether he ever mentioned who it was or told them to stop him and all that. What about, could there be a communication when Mr. Cardamone decided to pull up alongside the van? Could his conduct itself be a communication? I don't believe the trial court found that it was, and the evidence of when he pulled up next to her was that he and his wife glanced at her, she looked straight ahead, and that's all that happened. So they're both on the road, on the public road at the same time, and he happens to pull up next to her and glance at her. That couldn't be a communication, or at least there's no evidence to support an inference, that that would be a communication with the intent to annoy the witness. Something in the facts, and I don't know whether it would fall under the anguish or even the communication prong, I noticed in the facts Elizabeth, Mr. Cardamone's wife, right, was in the back seat with the couple's 7-month-old son, became fearful, and told the defendant to call 9-1-1. Yes. Are we to infer anything from the fact that the wife was fearful for her child and the alleged erratic driving of the driver of the minivan in this case, and then would still choose to pull up alongside that vehicle? Could that go to any type of intent to communicate? I don't know that it was at a stoplight. The car would have been stopped, not driving erratically at that moment, so I don't know that we could infer anything from that. We might be able to infer the reason why Mr. Cardamone called 9-1-1, because his wife wanted him to, but I don't think we could infer anything about the driving from that, because at the moment they pulled up, there was a stoplight, they were stopped. Was it a stoplight? That's what the testimony was, yes, sir. Thank you. So the question is, what did he intend by calling 9-1-1? And as I said, we have to look at what did he report? It's not just a generic 9-1-1 call, he reported something specific. So before I go on, I want to emphasize that Mr. Cardamone is not arguing that a 9-1-1 call can never be the grounds for a harassment of a witness. It depends on what's reported in that 9-1-1 call. The content of this call is undisputed. The tape recording of the call was played in court, and there's no dispute about what was said. What he reported in this 9-1-1 call was a suspicion. He reported what he described as another car swerving. He reported that he thought he saw the driver drinking something. But it's undisputed that he did not report that he saw the driver drinking alcohol. The police officers... Counsel, let me ask, right here in the middle. Is it unreasonable to think that an inference to be drawn from that statement is that his goal was to have the police stop the car, cause the emotional distress that would be caused by that in the normal course of events? Thank you, Your Honor. Actually, that's the heart of what I'm arguing. What did he intend? The reasonable and foreseeable consequence of reporting what he reported would be to have the police take a look at her driving. He didn't say, if he had reported, I saw her swinging from a bottle of Jack Daniels, we'd have a different case. But he didn't. He said he saw, he thought he saw, he didn't even say he saw a bottle. He said, I thought I saw a bottle. People drink lots of things from bottles, bottled water, soft drinks. Wouldn't it be, once you're a couple erratic driving with drinking from a bottle, that there would be reasonable suspicion? Well, that was his suspicion. That it was alcohol? That was his... On the part of whatever policeman got that message. No, Your Honor. That was the basis for Mr. Cardamom's suspicion, but he's not a police officer. Counsel, when in point of time did he pull up next to the victim? Was it before or after the 911 call? Or do we know? Mr. Cardamom testified that it was afterwards. She testified, the complainant testified, that she wasn't exactly sure when. Of course, she didn't know exactly when the call was made, so we don't really know the answer to that. The only thing we have in the record is his testimony and his wife's testimony that he pulled up next to her after making the call. They said, I think they testified that they were curious to get a look at this person. And that's why they pulled up and they looked at her. And Mrs. Cardamom testified that she said, oh, my gosh, it's Mrs. Eason. So he said their testimony was that they were completely surprised to find that this person that they had reported was Mrs. Eason, the witness in this other case. However, the trial court, it's not entirely clear to me how, but the trial court made the inference that they knew it was her when they made the call. Did Mrs. Eason testify? She made eye contact with him? She testified that she kept looking straight ahead and she saw out of her peripheral vision that it was them. So that was it there. Mr. Levine, putting aside the fact that, you know, whether an officer would determine that they should pull somebody over based on somebody saying there's drinking and erratic driving, regardless of mentioning alcohol or not, when you said it was Mr. Cardamom's suspicion, wouldn't the reasonable driver, we're dealing with his intent, right? Wouldn't the reasonable driver who makes a report to 911 coupling drinking and erratic driving, forget the officer, wouldn't that reasonable driver suspect and intend for a police officer to not only follow and make their own observations, but actually pull that person over? Well, it's, he may have hoped that a police officer would pull that person over. But... But all this points to his intent. Well, no, not necessarily, Your Honor. For example, you see me standing in front of you right now making an argument. It would be reasonable for you to infer that I hope that you're going to rule in my client's favor. But everybody, everybody expects this court to make its own judgment based on the law. You're not going to make your ruling based on what I want you to do or what you think I want you to do. You're going to make your own independent judgment on what's the law. And that's what everyone, that's what everyone naturally expects. And it was the same thing with Mr. Cardamom and the police. He may have hoped that the complainant, Mrs. Eason, would do something while the police were watching her that would create a reasonable suspicion for a stop. He may have hoped that she would swerve and act crazy while the police was watching her. He may have hoped that she would make a turn without signaling or something. He may have hoped that. But his call, what he did, did not provide a reason for the police to stop her. Unlike if he had reported, as I said, if he had reported I saw her drinking alcohol, if he really wanted the police to stop her, he could have reported something like that. If he's going to make up something, he could have reported she has a trunk full of cocaine or she's drinking alcohol or she's been shooting a gun out the window or something. He didn't report that. What if his call said, I see a driver in front of me driving erratically. I saw a bottle. I would hope that you would call the police, and I hope that the police pull that person over. Would that be enough? I think that even except for saying I would hope the police pull the person over, that's our case right now. You reported I saw a bottle and I saw her swerving. I'm adding hope. You're adding he said hope? He said hope. I don't know that that changes it. I think you can reasonably infer that you could go so far as to infer that he hoped. Because isn't what we're dealing with exactly that, his hope, his intent, not what eventually happens? Well, you see, I'm distinguishing between hope and a reasonable expectation of what's actually going to happen. I understand that. Because what he would reasonably expect is for the police officer or any police officer to look at her. That's what he expected, not a stop, reasonably expected. Expected her, expected the officer to look at her and make his own determination, just like this court will make its own determination about whether a stop is justified. Except for one fact, and that's the bottle in the car. Yes, sir. Even if the officer sees the driver driving properly, there's still the statement relative to the bottle being in the car. And I think that that could be inferred as an intent to have the car stopped by a police officer. Just the opposite, Your Honor. Okay, I'm listening. Because that's what he did say. He said I saw a bottle. Now, most drivers who are out there drinking from bottles are not drinking alcohol. They're drinking bottled water. They're drinking Coca-Cola. They're drinking other things. Most drivers drinking from bottles, and you know this from driving on the highway, most drivers who are drinking something are not drinking alcohol, fortunately. Let me ask a slightly different question. Yes, sir.  Do you believe that the call was a known falsehood, that there wasn't any heretic driving and there wasn't any bottle? Does that have any significance? The trial court did make that finding a fact, that she was not swerving. The basis for its finding apparently was Mr. Cardamone testified that she swerved first to the right or the other way, and Mrs. Cardamone said she swerved first to the left or it might be vice versa, I don't remember, but they disagreed. The court found that that was a contradiction in their testimony. Mrs. Eason testified that she didn't swerve, and so the court said, okay, I've got a contradiction here. She's the only one testifying, so I'm going to believe her. That's the finding that the trial court made. As for whether there was a bottle in the car, she said there was not. The police officer who leaned into the car and looked didn't see a bottle, whether there was one under the seat, I don't know. Mrs. Eason also testified that at some point during the strip she applied lipstick, which would have meant that she would necessarily have brought something to her mouth that could have appeared, and that could have been what he saw. We don't really know exactly what he saw. I think it's pretty clear that he didn't make this up from whole cloth, however, because if he did, he could have made up a much better story if what he wanted was to have her stopped. He could have made up a lot more detail. Mr. Levin, do you really think that the average driver on the road does a quick assessment of their idea of the law and what may or may not constitute a legal versus a legal stop, or do you think the average driver on the road would expect this person to be pulled over based on that call? You're asking me to – well, you know, we say we presume that people know the law. That's – you and I know that's kind of a fiction, but the law is based on that. Well, let me just tell you, we've had cases in front of us, and you know of cases similar, where police officers have made stops, legal and illegal, based on various facts, right? Those are motions that come before the court all the time. So, you know, I think we should – based on that, you could say that the police officers don't always know the law. I'm talking about the average driver. Call somebody up and says, I see somebody drinking, they're driving erratically. Do you really think the average driver on the road expects the police to do their own surveillance of that, or do you think there's an expectation by that driver that the police will pull them over? Well, I haven't done a poll, I don't know. I have to hope that citizens of our country expect the police to make reasonable judgments rather than just simply going out and stopping people. Our Fourth Amendment, our whole system is based on police having reasons for stopping people and not just doing so because someone else called it in. As I mentioned in my brief, we're all familiar with the stories about the Nazis sending in false reports in order to eliminate a rival. Well, we don't do that here, and I hope that the citizens of our country don't expect the police to do that and don't want the police to do that. Mr. Levin, I want you to return over here. I'm sorry, I'm deaf in one ear. I'd like you to return to your original opening statement with regard to emotional distress, whether or not the defendant could have intended to produce emotional distress. The statute really doesn't define emotional distress, nor I want to know what the relevance is then, whether the defendant intended to produce it. Well, the statute requires that he intend to annoy or harass. Right. And so he has to intend that something happen to the complainant. But you described that could he have intended to produce emotional distress? Right. If he didn't intend for the police to stop her based on his suspicion and intended merely to have the police take a look at her driving and assess whether she needed to be stopped, if that's what he intended and the policeman had followed her as he did, followed her for half an hour and didn't see her doing anything wrong, then she wouldn't even have known that any of this happened. So she wouldn't have been annoyed. There wouldn't have been any communication at all, none of this. So the question is, what did he intend by doing this? Did he intend to have her stopped? If he didn't intend to have her stopped, but merely intended to have her driving scrutinized, then he didn't intend to annoy. And in the statute, that's one of the elements, that's the specific intent that's required, the intent to annoy. So if he didn't intend to communicate anything to her, then he didn't intend to annoy her. So it's your position that it is not sufficient that he set in motion a series of events that ended up with her being stopped. He had to have intended that she be stopped. So in other words, he had to intend the precise parameters of the communication in order to be sufficient. Well, that might be a little more, I'd like to make that argument, but I don't think I reasonably could make that argument. You have to infer that he intended the reasonable and probable effects of what he did, not all the possible effects. What if, for example, the policeman had shot her? This would be beyond anything that could have been expected. Shall I continue or shall I stop? I'd like you to finish answering the question. Okay. It can be inferred that he intended what's reasonable and probable, not that he intended everything that possibly could happen. Lots of things could happen. You know the butterfly in China theory that one thing causes events around the world. But at some point these events, even though you may be able to trace it back step by step and find a causal link, at some point they're just too remote for the law to find someone guilty of a Class II felony based on this remote link. Thank you. Thank you. You may proceed. Good morning. I'm Erin O'Connell, an Assistant Attorney General on behalf of the people of the State of Illinois. I'd like to first address what exactly happened in that case, and that's set forth very clearly in the trial court's opinion in terms of who was credible in this case and therefore what were the facts that actually occurred. That court found that Teresa Eason was not driving erratically. She was not doing anything out of the ordinary. That was an actual finding. The court also found that at the time defendant made the 911 call, he knew the driver of the car was Teresa Eason. So from these facts, the court found that there could be no reason other than an intent to harass Teresa Eason that would explain what was clearly a false report to 911. So counsel focused a lot on whether this was a communication, this use of police authority to indirectly communicate with the victim. Clearly it was. The defendant, why would the defendant place a call to 911 and falsely report that he's observed a swerving behavior by a driver? Furthermore, that she has a bottle. What could be his intent other than to have a police officer intervene in some fashion? I think your honors are correct that the average citizen does not know the nuances of probable cause law. It is reasonably probable that the police officer will pull over someone if they receive a report that she's been driving very dangerously and that she possibly has alcohol in the car. The defendant argues that he didn't say precisely, well, she had alcohol. Well, he couldn't really have known that she had alcohol, but what he did say was she has something that looks like a bottle that she's drinking from. This was a fabrication. The police officer that examined her car afterward found no bottle. All of the witnesses testified that she never at any point threw anything out of her window. So this fabrication was, although it wasn't possibly the best story that the defendant could have come up with, the clear implication of his report to 911 is he's reporting this is a drunk driver. Having that in front of us, any person making such a call intends that the police officer will probably pull her over. And I just want to address some of the points that were made in the reply brief in terms of what is this standard of foreseeability. The case that defendant cited was People v. Lurie. This is 178 L2 462. This sets it forth. This defeats his case. This says that the defendant need only know to a reasonable probability what would happen. The facts in this case, the defendant here was engaged in an armed robbery. One of his victims took his gun and fired a shot as the defendant was running, killing a bystander. Clearly that's not what you would know to 100% certainty would occur during the course of an armed robbery, but it is certainly foreseeable. The court also said in that case that there is a principle that if there is an intervening cause, then it can cause a break in the causal sequence. However, the intervening cause must be completely unrelated to the acts of the defendant. In this case, the police officer's arguable misconduct in pulling over Teresa Eason in the absence of any further information or observations of erratic driving was perfectly related to defendant's phone call to him, because the information that he received from the call was the information that he used to make the traffic stop. So in this case, under Lori, clearly this was foreseeable, and therefore we can easily conclude that the defendant intended in making his call that the police would pull her over. Do you know of any reported cases where a third party, such as the officer in this case, was a means of indirect communication? There has not been very much precedent in terms of what constitutes an indirect communication. However, we know from the statute, by its inclusion of the word indirect, that it meant to encompass novel means of communicating with a victim. Have you looked at the legislative history surrounding this? I have not, to be honest. If they give any indication of what they meant by indirect communication, would it include text messaging, e-mails, things that are coming out of modern day society, and not the use of a third party? You know nothing about the legislative history? I don't, and I would just argue that the statutory language is unequivocal on its face, and therefore that there's no need to resort in this particular case. That would include text messaging, e-mails? Yes. I think that comes within the definition. Those would even be direct forms of communication. Ms. O'Connell, there is no testimony by the police officer that he did any independent observation before the stop, right? He testified that he followed her for some distance, and that he saw no improper driving at all. So there was that testimony. So his stop was based entirely on the content of the 911 call. Ms. O'Connell? Yes. What part of the officer's communication, the indirect communication with the witness, what was his action that caused, under the statute, the production of mental anguish or emotional distress? What conduct did he... It wasn't the conduct of the officer, and the people are not alleging that it was any wrongdoing by him that resulted in the emotional distress. What caused the emotional distress was the victim's knowledge that it was the defendant who had placed a false call to 911, and thus engaged the police to falsely and fraudulently pull her over on her way home. And in this case, just to emphasize, they were both on their way home from a court hearing that dealt with the criminal case at which this witness was potentially going to testify against the defendant. The witness saw that the defendant was driving directly behind her. The people have never alleged that defendant's simple act of being on the roadway was in any way misconduct, but it certainly goes to her state of mind in terms of what was the context that she viewed this within. And that was, she was nervous, she was made nervous by the defendant. She knew immediately that it was the defendant that placed this call, and the distress that she suffered was knowing this defendant engaged in an act that was intended to interfere with her peace, and that it was solely because she was a witness against him. And that causes quite a bit of anger, and I think some reasonable anxiety that, well, if this defendant is willing to do this and falsely engage law enforcement, what else might he be willing to do to interfere just due to my status as a witness? So, Ms. O'Connell, under the statute, your theory is that when it says the person, in this case the defendant, has to communicate directly or indirectly, you're saying the act of communication was placing the 911 call? Yes. That set in motion the events. And if the police had not pulled her over, there couldn't have been a complete communication, because it did have to be he made the call, and then it had to be at some point communicated to her that he had made the call. So the police intervention was necessary in order to complete the communication, but defendant's own act under the statute would have been his placing of the call. So under the witness harassment statute, a rational fact finder could clearly conclude that this defendant had done an act that was intended to interfere with the witness's peace and tranquility. That was clearly warranted under the facts. Therefore, unless the court has any further questions, we would simply ask that this court affirm the judgment of the appellate court affirming his conviction. One other question. Yes. Following up on Justice Kilbride, and I think you covered this, but would Mrs. Eason have to have known at the time that the police stopped her that this stop was put in motion by the call from the defendant in this case? And does the record reflect that she did know that at some time? The record reflects that she definitely did know in this case that it was the defendant that placed the call. It would be a much more difficult case if she didn't know at the time and never knew that it was the defendant that placed the call. But here the defendant was directly behind her on the road. She saw him behind her, he and his wife, doing something and kind of laughing, so she was kind of already on edge. And then because there was no basis whatsoever for a police officer to pull her over, she knew pretty clearly that it must have been the defendant that did so. And, in fact, as a 911 call indicates, it was the defendant. Thank you. And she testified to that, right? Yeah. She said to the police officer, I know who it is. Exactly. Yes. The police officer said to her, we received a call that said you were a possible drunk driver. Immediately she said, oh, I know who that is. That's the person that I was just at a court hearing for that, you know, committed a crime against my daughter. Any further questions? Thank you, Counsel. Thank you. Thank you. This communication was so remote and so indirect that it reached Ms. Eason through her own imagination. Now, it turns out that her imagination was right. It was Mr. Cardamone who made the call. But she testified that when she was stopped by the police, she said, I was already extremely nervous and upset because of the following home. She thought that Mr. Cardamone was following her. Although the testimony, she probably didn't know where he lived. But the testimony was undisputed that he lived down the same road a bit farther south from her. So this Eola Road that they were both on was the direct route home for both of them. He wasn't following her home. She left the same court hearing a little before he did, and they were both going home, and he was naturally behind her. He wasn't following her home, but she thought he was. She testified that that frightened her, that she saw him behind her. So when she was stopped, this sprang to her mind. He must have been the one who called the police because she was already terrified. But it wasn't anything that Mr. Cardamone did with intent to terrify her. Yes, she was terrified. But this came from her own imagination. She saw Mr. Cardamone and his wife laughing in the car behind her, she testified. And so she assumed, she testified, that they were laughing at her. She assumed that they were laughing, that she said, I'd seen that something was going on. Well, this is what she thought. But you can't infer anything about the defendant's intent from the complainant's imagination. She did testify, though, that she was upset when the police officer stopped her. Yes, she did. She did. She said that in the sentence after she said, I was already extremely upset from the following home. And then she said, and also she said, like any time you see police lights come on behind you, your heart drops and so on. She did testify about that. But in the previous sentence, she had just said that what really upset her, what really made her angry, was her belief that it was Mr. Cardamone, who she was already furious at because of this other criminal case, that her belief that it was him who did this. Although she had no, like I say, it turns out she was right, but she had no information. No information had been communicated to her. The police officer did not say, Mr. Cardamone called 911. She thought of this. Now, the state asked the same question that I asked. Why else would Mr. Cardamone have called 911? And I think I tried to answer that in my original argument. It was to have the police take a look at her driving. And you can't infer that it was to have her stop, because that would be beyond the law. If you have any other questions for me, I'll try to answer them. Otherwise, I'll sit down. Thank you very much. Thank you very much, Counsel. Case number 106-200. We'll be taking that.